UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHANIE S., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:23-cv-30046-KAR |
| ) | |
| MARTIN O'MALLEY, Commissioner, ) | |
| Social Security Administration,[1] ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE
COMMISSIONER'S DECISION
(Dkt. Nos. 14 & 17)

ROBERTSON, U.S.M.J.

I.   INTRODUCTION AND PROCEDURAL HISTORY

Stephanie S. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner denying her application for Social Security Disability Benefits ("SSDI").  Plaintiff applied for SSDI on or around February 22, 2021 alleging a February 8, 2021 onset of disability due to kidney stones, kidney reflux, partial nephrectomy, incontinence, and UTIs (Administrative Record "A.R." at 241).[2]  Her application was denied initially (A.R. at 139-140) and on reconsideration (A.R. at 148).  She requested a hearing before an administrative law judge ("ALJ"), and one was held (remotely) on February 8, 2022 (A.R. at

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Martin O'Malley, Commissioner of the Social Security Administration, is substituted for Kilolo Kijakazi, former Acting Commissioner of the Social Security Administration.

[2] Citations to "A.R." refer to the administrative record found at docket number 10.  The page numbers, assigned by the Social Security Administration ("SSA"), appear in the lower right-hand corner of each page.

1

93-127).  On June 1, 2022, the ALJ issued an unfavorable decision on Plaintiff's claim (A.R. at 40-63).  The Appeals Council denied review on March 15, 2023 and, thus, Plaintiff is entitled to judicial review (A.R. at 1-4).

Plaintiff seeks remand based on her contentions that the ALJ erred by failing to assign controlling weight to opinion evidence from Plaintiff's treating urologist (Dkt. No. 15 at 9, 14).  Before the court are Plaintiff's motion for an order for judgment on the pleadings (Dkt. No. 14) and Defendant's motion to affirm the Commissioner's decision (Dkt. No. 17).  The parties have consented to this court's jurisdiction (Dkt. No. 11).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court GRANTS Plaintiff's motion and DENIES the Commissioner's motion.

    II.    Legal Standard for Entitlement to SSDI

A claimant is disabled under the Social Security Act if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A).

The ALJ evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The hearing officer must determine whether: (1) the claimant is engaged in substantial

2

gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the ALJ must assess the claimant's RFC, which the ALJ uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate her RFC.  *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding her restrictions and limitations.  *See Goodermote*, 690 F.2d at 7.

    III.    STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).  Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill*, 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo, id.*, but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981)).  "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee*, 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

IV.     T<small>HE</small> ALJ'<small>S</small> D<small>ECISION</small>

At the first step of the sequential evaluation, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2024, and had not

engaged in substantial gainful activity since November 19, 2018, the alleged onset date (A.R. 42). At the second step, the ALJ found that Plaintiff had the severe impairments of a history of kidney stones (stent placement in the left kidney in June 2021), history of kidney cancer (status post partial nephrectomy in August 2018), overactive bladder (status post mid-urethral sling operation in May 2019), obesity, and asthma. She further found that Plaintiff had the non-severe impairments of a cholecystectomy in 2018 and depressive disorder (A.R. at 42). At step three, she found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 45). Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) except the claimant can perform occasional stooping, crouching, crawling, kneeling and climbing ramps and stairs. The claimant cannot climb ladders, ropes or scaffolds and cannot balance as defined in the DOT/SCO. The claimant cannot tolerate exposure to hazards, such as dangerous moving machinery and unprotected heights. The claimant requires access to the bathroom within five minutes of need.

(A.R. at 45). At step four, based on testimony from a vocational expert, the ALJ found that the claimant was capable of performing work she had previously performed as a general hardware salesperson. The ALJ nonetheless proceeded to step five, finding that there were other jobs that existed in the national economy that the claimant could also perform (A.R. at 54). On this basis, the ALJ concluded that Plaintiff was not disabled (A.R. at 56).

    V.    ANALYSIS

Plaintiff takes issue with the ALJ's rejection of critical aspects of the opinion of Jonathan Starkman, M.D., Plaintiff's urologist, who began treating her for her complex urological problems in or around November 2019 (A.R. 653). For his part, the Commissioner argues that the ALJ was not required to give controlling weight to the opinions of a treating source and

5

contends that the ALJ's decision was supported by substantial evidence in the record. The Commissioner is wrong.

      A.      <u>Evaluating Opinion Evidence</u>

"Under the regulations governing [Plaintiff's] application, an ALJ does not assign specific evidentiary weight to any medical opinion and need not defer to the opinion of any medical source (including the claimant's treating providers)." *Richardson v. Saul*, 565 F. Supp. 3d 154, 167 (D.N.H. 2021) (citing 20 C.F.R. § 404.1520c(a)). A "medical opinion" is defined as:

> a statement from a medical source about what [a claimant] can still do despite [her] impairment(s) and whether [she has] one or more impairment-related limitations or restrictions in the abilities . . . to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching) . . . [and] to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting.

20 C.F.R. § 404.1513(a)(2)(i), (ii). The most important factors to be considered in assessing the persuasiveness of a medical opinion are "supportability" and "consistency." 20 C.F.R. § 404.1520c(a), (b)(2). As regards supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). "Objective medical evidence is medical signs, laboratory findings, or both . . . ." 20 C.F.R. § 404.1513(a)(1). As regards consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). Other factors that an ALJ should weigh are the medical source's relationship with the claimant,

6

the source's medical specialization, and what the SSA refers to as "other factors" that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(3)-(5). "A medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion." 82 Fed. Reg. at 5854. An ALJ is required to consider how persuasive she found the medical opinions from each medical source and must evaluate the supportability and consistency factors for each medical opinion in the record but is not required to address the other factors. 20 C.F.R. § 404.1520c(b)(1)-(2); *see also Richardson*, 565 F. Supp. 3d at 167-68 (discussing the ALJ's obligations to explain her treatment of medical opinion evidence).

  B. <u>Dr. Starkman's Opinions</u>

Dr. Starkman submitted the following opinions concerning Plaintiff's functional limitations:

> The patient [Plaintiff] has severe medically refractory lower urinary symptoms and urinary incontinence which are on a par with and comparable to severe interstitial cystitis, which is a common reason why patient's [sic] may be unable to work due to severe debilitating urinary urgency, urinary frequency and incontinence and bladder discomfort.
>
> It would be my medical opinion that her severe lower urinary symptoms and incontinence fall into a condition spectrum whereby the patient would have great difficulty maintaining a productive work experience in any meaningful capacity, given the fact that she has to use the bathroom 3-4 times per hour which is causing a significant impairment on her physical and emotional well-being.

(A.R. 964). Dr. Starkman offered to make himself available should the SSA have questions or require further information about his patient (A.R. 964).

The ALJ found that Dr. Starkman's opinion that Plaintiff would have great difficulty in maintaining a productive work experience because she would need to use the bathroom 3-4 times per hour was not persuasive because there were no objective records to support his statement

7

about the frequency of her need to urinate and because her review of Dr. Starkman's treatment records showed that he had not documented the frequency of urination and his evaluations indicated that no further treatment was planned.  She noted that Dr. Starkman's records reflected that Plaintiff reported working part-time as a cleaner, which conflicted with his opinion that she would need to use a bathroom 3-4 times per hour, and that laboratory studies were normal and that Dr. Starkman repeatedly documented normal examinations.  Thus, she concluded, "the opinion of Dr. Starkman [wa]s not persuasive as it [wa]s not consistent with the longitudinal record or supported by the evidence as a whole" (A.R. at 51).  The ALJ's findings are sufficiently flawed in multiple respects to require remand.

First, the ALJ failed to address one of Plaintiff's claimed disabling impairments, which is reflected repeatedly as a diagnosis in Dr. Starkman's records.  As noted above, when Plaintiff submitted her application for disability benefits, she claimed to be disabled by incontinence (A.R. at 241).  Dr. Starkman's records repeatedly reflect a diagnosis of urge incontinence.  The ALJ found that one of Plaintiff's severe impairments was an overactive bladder that had been treated by a May 2019 urethral sling operation (A.R. 42).  MedlinePlus defines an overactive bladder as a condition "in which the bladder squeezes urine out at the wrong time." MEDLINEPLUS, https://medlineplus.gov/overactivebladder.html# (last visited Aug. 26, 2024).  An overactive bladder may be diagnosed when an individual has two or more of three symptoms: the individual urinates eight or more times a day or two or more times a night; an individual has a sudden, strong need to urinate immediately; and/or the individual leaks urine after a sudden, strong urge to urinate.  *Id.*  In contrast, MedlinePlus defines urinary incontinence as the situation that occurs when an individual is not able to keep urine from leaking out of the individual's urethra and explains that the label of incontinence may be applied when an individual leaks urine

from time to time or when the individual is not able to hold any urine.  MEDLINEPLUS, https://medlineplus.gov/ency/article003142.htm (last visited on Aug. 26, 2024).  Nowhere in the ALJ's decision did she acknowledge or address the frequently repeated diagnosis of urinary incontinence, nor did she acknowledge or address the distinction in Dr. Starkman's treatment notes between Plaintiff's stress incontinence, which was addressed and ameliorated by the urethral sling placed in May 2019 (A.R. at 653), and the urge incontinence that she developed by mid-2019.  Dr. Starkman repeatedly described this condition as severe and refractory and noted that it was unresponsive to multiple treatment efforts (A.R. at 653, 658, 660, 662, 666, 671, 800, 802, 912, 919, 921, 957, 959).

On November 7, 2019, Dr. Starkman's treatment notes indicate that notwithstanding that a urethral sling had addressed the problem of stress incontinence, Plaintiff was still experiencing urinary incontinence, which had been increasing in severity for five months.  His notes reflected unsuccessful trials of drug treatments (A.R. 653, 655).  On December 27, 2019, Dr. Starkman's treatment notes reflect a diagnosis of urinary incontinence, bladder hyperactivity, and detrusor instability (A.R. 660).  On January 28, 2020, Dr. Starkman's treatment notes report that Plaintiff suffered from urinary incontinence, lower urinary symptoms, and a long history of mixed urinary incontinence with a marked deterioration in urine control.  He recorded that urodynamic testing documented a high amplitude of detrusor overactivity (A.R. 662).  A March 2, 2020 appointment was to follow up on a cystoscopy which showed that her urodynamics were consistent with high amplitude detrusor overactivity.  Plaintiff reported "debilitating urgency and urge incontinence" (A.R. 666).  There is no indication that Dr. Starkman questioned Plaintiff's report of her condition.  At this appointment, Dr. Starkman noted that Plaintiff had failed medical therapy and pharmaceutical options for her incontinence and discussed the risks and benefits of a sacral

9

neuromodulation therapy trial (A.R. 669).  At a February 16, 2021 appointment, a physician's assistant noted that a lack of insurance coverage had prevented Plaintiff from pursuing the sacral neuromodulation procedure Dr. Starkman had recommended.  Plaintiff continued to experience urge urinary incontinence.  Diagnoses included urge incontinence of urine, and, separately, hyperactivity of the bladder (A.R. 671, 674).  Plaintiff saw Dr. Starkman again on October 19, 2021, following surgery for a kidney stone in June 2021.  Plaintiff reported worsening urinary control over the last three months, including urinary urgency, frequency, and urge incontinence.  Dr. Starkman's summary on October 19, 2021, stated that he had discussed Plaintiff's worsening urinary incontinence with her, reviewed the results of her urodynamic testing, and, in view of her failure to improve on three pharmaceutical interventions and by lifestyle modifications, recommended that she consider an injection of botulinum toxin (A.R. 802).  On November 12, 2021, Plaintiff had a videoconference appointment with Dr. Starkman, with whom she again discussed an injection of botulinum toxin to treat refractory urinary urgency, frequency, and urgency incontinence and bladder hyperactivity/overactivity (A.R. 921).  Dr. Starkman administered the botulinum toxin on February 17, 2022 (A.R. 957).  At a March 24, 2022 surgical follow-up, Dr. Starkman diagnosed urge incontinence and, separately, an overactive bladder (A.R. 961).  In June 2022, Dr. Starkman recorded that the botulinum toxin injection had failed, that Plaintiff reported persistent urge incontinence, difficulty deferring micturition, and a significantly overactive bladder, and that Plaintiff was wearing Depends (A.R. 30).  Dr. Starkman reviewed further invasive treatment options.  The notes reflect that Plaintiff opted to maintain the status quo with Depends and conservative management (A.R. 31).

    The ALJ's failure to address the separate diagnosis of refractory urge incontinence matters because "'incontinence may be an impairment for purposes of the Social Security Act

and must be considered by the Commissioner in determining whether a claimant is disabled.'" *Aguero v. Saul*, Civil Action No. 3:18-CV-3342-BH, 2020 WL 1493551, at *9 (N.D. Tex. Mar. 26, 2020) (quoting *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999); citing *Reese v. Astrue*, Civil Action No. 08-1423, 2010 WL 439528, at *4 (W.D. La. Feb. 4, 2010), *March v. Comm'r of Soc. Sec. Admin.*, 559 F. Supp. 2d 722, 731 (N.D. Tex. 2008)). *See also, e.g., Angerer v. Berryhill*, 17-CV-739, 2019 WL 1375089, at *3-5 (W.D.N.Y Mar. 27, 2019) (holding that the RFC was not supported by substantial evidence because the ALJ's assessment of Plaintiff's functional limitations attributable to her urinary incontinence was based on his impermissible interpretation of the medical records); *Quijano v. Sec'y of Health & Human Servs.*, 791 F. Supp. 39, 40-41 (D.P.R. 1992) (stating that urinary incontinence is an impairment under the Act that an ALJ is required to consider; remanding case to the SSA) (citing *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986)).

While the record supported the ALJ's finding that Plaintiff suffered from an overactive bladder, that condition, according to her treating care provider, was not the full extent of her lower urinary tract problems.  "[T]he presence or absence of incontinence is objective," *Pascariello v. Heckler*, 621 F. Supp. 1032, 1037 (S.D.N.Y. 1985), and, on this record, uncontradicted.  Plaintiff testified that when she was standing or walking, she had little to no bladder control.  Incontinence pads or adult diapers helped but did not hold all the urine that she leaked (A.R. at 99-100).  "The record contains no evidence to directly contradict [Plaintiff's] testimony about her [incontinence] and [its] frequency and severity, nor the medical report[] supporting [it]." *Sacilowski v. Saul*, 959 F.3d 431, 439 (1st Cir. 2020).  The ALJ either ignored or overlooked the diagnosis of incontinence, or she substituted her judgment for that of the medical providers by finding that Plaintiff's only impairment related to incontinence was an

overactive bladder treated by a urethral sling rather than an overactive bladder and refractory urge incontinence. An ALJ may not ignore medical evidence or substitute her judgment for that of medical professionals as occurred in this case. *Nguyen*, 172 F.3d at 33.

Second, the ALJ's reasons for rejecting of Dr. Starkman's opinions are not in compliance with the SSA's governing regulation. The ALJ's discussion of Dr. Starkman's opinion evidence was not phrased in terms of supportability and consistency as dictated by the regulations. The problem, however, is not limited to this semantic deficiency. It appears that the ALJ found that Dr. Starkman's opinions were not supported because his records did not include objective evidence confirming his opinion about the extent of Plaintiff's incontinence or that Plaintiff would need to use the bathroom three to four times an hour. As to such support, Dr. Starkman's records reflect that he performed a cystoscopy in early 2020 that showed high amplitude detrusor activity (A.R. 662, 666), which is objective medical evidence confirming Plaintiff's urge incontinence. Further, in June 2021, Dr. Starkman reported that her overactive bladder symptoms score was 22 (A.R. 800). While the records do not disclose what this score indicates about the frequency of Plaintiff's need to urinate and it would require a specialist's medical knowledge to understand the import of the score, the inclusion of the score appears to contradict the ALJ's statement that Dr. Starkman failed to document the frequency of Plaintiff's need to urinate. That the ALJ may not have understood the evidence is not a justification for the statement that it did not exist, particularly where Dr. Starkman expressed his willingness to answer any questions or concerns, or to provide further information if such information was needed (A.R. 964).

As to consistency with other evidence in the record, to the extent the ALJ relied on diagnostic testing that showed largely normal results as a basis for rejecting Dr. Starkman's

opinion about the frequency of Plaintiff's need to urinate (A.R. 51), "a clear cystoscopy merely means that there were not abnormalities within her bladder. It does not undermine the fact that Plaintiff suffers from urge incontinence and urge frequency." *Johnson v. O'Malley*, Civil No. 2:23-cv-02137, 2024 WL 3799506, at *4 (W.D. Ark. July 29, 2024), *adopted*, 2024 WL 3798405 (W.D. Ark. Aug. 13, 2024). Contrary to the ALJ's assertion that Dr. Starkman's opinions were not consistent with the longitudinal record as a whole (A.R. 51), that record confirmed a complex and problematic urological history, including severe, refractory urinary incontinence. Plaintiff had a partial nephrectomy for renal cancer in late August 2018. This operation was followed almost immediately by a second operation for a pseudoaneurysm in the same kidney (A.R. 483). In June 2021, Plaintiff had surgery for a kidney stone in her left kidney. Testing at the time showed the presence of stones in both kidneys (A.R. 728). When Plaintiff established care with Pioneer Valley Urology, P.C. in November 2019, she already had a urethral sling which she reported had prevented stress incontinence, but urge urinary incontinence, which had been worsening for some five months, remained an active problem (A.R. 653). In her function report filled out in connection with her application for disability benefits, Plaintiff identified inability to control her bladder, causing incontinence, as *the* condition that disabled her from working (A.R. 277). As is set forth above, at every visit to the urologist's office, urge incontinence was identified as an active problem for Plaintiff. Contrary to the ALJ's finding, the longitudinal records are consistent with Dr. Starkman's opinions in his March 28, 2022 letter.

While it may be accurate to say that Dr. Starkman did not plan further interventions, the record confirmed that Dr. Starkman had tried a variety of approaches over time to treat Plaintiff's incontinence. Those treatments included a Botox injection, pharmaceuticals, and a prior sling procedure; all had failed to alleviate Plaintiff's incontinence (A.R. 30). Dr. Starkman offered

further treatment options to Plaintiff, including removing the sling, which carried a high likelihood of recurrent stress incontinence, and sacral neuromodulation, a procedure that he explained carried the risk of infection, lead migration, loss of response to stimulation, subsequent operative interventions, electric shock, nerve pain, uncomfortable and painful stimulation, and sacral nerve root injury (A.R. 668). In view of a recent surgical history that can fairly be characterized as traumatic, Plaintiff's choice to continue management with Depends and conservative therapy cannot reasonably be viewed as inconsistent with Dr. Starkman's opinions about the severity and disabling character of her incontinence (A.R. 31).

The ALJ's reliance on Plaintiff's attempts to work as undermining Dr. Starkman's opinion is similarly unavailing. Plaintiff testified at the hearing that her incontinence and the time she needed to spend in the bathroom prevented her from working because her employer had been unwilling to tolerate the time she spent in the bathroom (A.R. 100-02). The record showed that she had tried to work, but, as acknowledged in the ALJ's decision, she had not been able to sustain work at the level of substantial gainful activity in 2019, 2020, or 2021, the time period during which she suffered from severe incontinence (A.R. 42). The vocational expert testified that if an individual performing unskilled work was off-task for 10% of the workday in addition to regularly scheduled breaks (to use the bathroom), that person would be unemployable (A.R. 119). The RFC in the ALJ's decision did not address the amount of time Plaintiff would need to spend in the bathroom during the workday.

The ALJ failed to address the remaining three factors set out in 20 C.F.R. § 404.1520c(c)(2). In this regard, the court notes that it is undisputed that Dr. Starkman is a urologist offering opinions in his area of expertise about a patient with whom he has an established treating relationship and whom he had seen regularly and frequently.

Plaintiff's claim of disability based on incontinence is not unique. Indeed, this case is very similar to the case of *Johnson*, 2024 WL 3799506, at *1-4. The Plaintiff in *Johnson* suffered from an overactive bladder and urinary incontinence. *Id.* at *2. Despite having undergone a bladder sling procedure, she experienced urinary frequency and urge incontinence, meaning that when she felt a need to urinate, she could not control her bladder. Her records reflected complaints of urinary incontinence and frequency. She had been advised that Botox and a bladder pacemaker were the only remaining treatments. Test results showed no abnormalities in her bladder. *Id.* at *2-3. The ALJ denied the claim because the plaintiff's symptoms were at least somewhat amenable to treatment with medication, with no indication that further surgery was warranted, and unremarkable results of a cystoscopy. *Id.* at *4. The court reversed the ALJ's decision and remanded the case to the Commissioner for further consideration, finding that, as in this case, "there [was] nothing in the record to suggest that the Plaintiff exaggerated her symptoms or that her physicians questioned the veracity of her subjective reports," *id.*, and that the ALJ had not properly considered the obvious limitations that would result from Plaintiff's impairments. *Id.*

Plaintiff was thirty-five years old at the time of the hearing. She wore adult diapers around the clock (A.R. 54, 102, 104). Her treating urologist had opined that her refractory urge incontinence was on a par with and comparable to severe interstitial cystitis. While Dr. Starkman did not diagnose Plaintiff with interstitial cystitis, and, therefore, the ALJ was not required to analyze the claim in accordance with Social Security Ruling 15-1P, 2015 WL 1292257 (Mar. 18, 2015), the ALJ should have considered that the SSA has acknowledged that people with severe cases of interstitial cystitis "may need to void as often as 60 times per day, including nighttime urinary frequency (nocturia) with associated sleep disruption," *id.* at *4, and

15

that severe interstitial cystitis is an impairment "that can be the basis for a finding of 'disability.'" *Id.* at *2. Treatments for Plaintiff's diagnosed impairment of incontinence have been unsuccessful. Notwithstanding her condition, she tried to work without success. The ALJ's rejection of Dr. Starkman's opinions was inconsistent with the evidence in the record and, therefore, was not in compliance with the SSA's governing regulation, *see* 20 C.F.R. § 404.1520c(a)-(c). "[R]emand is necessary for the ALJ to reassess both the severity of the Plaintiff's urinary symptoms and her RFC." *Johnson*, 2024 WL 3799506, at *4. To the extent necessary to accomplish this task, the SSA should seek additional relevant information or clarification from Plaintiff's treating urologist(s).

VI. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 14) is GRANTED and the Defendant's Motion to Affirm the Commissioner's Decision is DENIED. The case is remanded to the Commissioner for further proceedings consistent with this opinion. The case may be closed on the court's docket.

It is so ordered.

Dated: September 3, 2024                    Katherine A. Robertson
                                            KATHERINE A. ROBERTSON
                                            U.S. MAGISTRATE JUDGE